IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| NORIA C. GREEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.  2:12-cv-277-MEF |
| | ) | (WO – Publish) |
| MOBIS ALABAMA, LLC, | ) | |
| JEREMY POWERS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Noria Green ("Green") brings suit against MOBIS Alabama, LLC ("MOBIS"), asserting claims based on Title VII for sexual harassment, gender discrimination, and retaliation, as well as violations of the Family and Medical Leave Act ("FMLA") (Doc. #42).  Green also asserts various state law tort claims against MOBIS and Defendant Jeremy Powers ("Powers").  Green's claims arise out of alleged sexual harassment by Powers and her termination based on what MOBIS claims were falsified doctor's notes Green submitted in connection with requests she made for FMLA leave.  Now before the Court is MOBIS's Motion for Summary Judgment (Doc. #58).  Powers has not moved for summary judgment.  For the reasons discussed below, MOBIS's motion for summary judgment is due to be GRANTED as to all counts.

### I. JURISDICTION AND VENUE

This Court has subject-matter jurisdiction over the parties' claims under 28 U.S.C. §

1331; 1343(a)(3); and 1367.  The parties do not dispute that venue is proper under 28 U.S.C. § 1391(b), and the Court finds adequate allegations supporting both.

## II. LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine [dispute] of material fact."  *Id.* at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322–23.

Once the moving party has met its burden, the non-moving party must "go beyond the pleadings and by their own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate 'specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotations omitted).  To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  A

plaintiff must present evidence demonstrating that it can establish the basic elements of its

claim, *Celotex*, 477 U.S. at 322, because "conclusory allegations without specific supporting

facts have no probative value" at the summary judgment stage. *Evers v. Gen. Motors Corp.*,

770 F.2d 984, 986 (11th Cir. 1985).

A court ruling on a motion for summary judgment must believe the evidence of the

non-movant and must draw all justifiable inferences from the evidence in the non-moving

party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  After the non-

moving party has responded to the motion for summary judgment, the court must grant

summary judgment if there is no genuine dispute of material fact and the moving party is

entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).

### III. FACTS

The Court has carefully considered the submissions of the parties in support of and

in opposition to the motion. The submissions of the parties, taken in the light most favorable

to Green, the non-moving party, establish the following material facts:

MOBIS operates a manufacturing plant in Montgomery County, Alabama that, among

other things, supplies plastic bumpers to Hyundai Motors Manufacturing Alabama, LLC.

Green, an African-American female, began working for MOBIS on February 21, 2005.  At

the times relevant to this lawsuit, Green worked in the Paint Department at MOBIS.  Her

duties were to ensure that the bumpers manufactured for Hyundai vehicles matched the color

of the vehicles to which they would be attached.

In December 2010, Powers, an African-American male, transferred to the first shift

3

in the Paint Department (3:00 a.m. to 3:00 p.m.), which was also Green's shift. At the time of his transfer, Powers was a Team Leader, which is an hourly-paid, non-supervisory position. Green claims that in January 2011 Powers began sexually harassing her. Powers sent Green inappropriate text messages (e.g., "Wanna come hold it . . . ha ha," "U look cute . . .," "kiss kiss"), including a picture of his erect penis, which he referred to as "Big Willie." These text messages were sometimes sent outside of work hours. Powers would stare at Green's breasts and said to her on at least one occasion that her nipples were hard. Green also claims that Powers touched her inappropriately. Powers would press himself against Green from behind and say that his penis was erect, grab Green's buttocks, and on two occasions grabbed Green's breasts. Green states that Powers did these things "very often" and "many times" over the course of several months beginning in January 2010.[1] (Doc. #60-1, at 42–43.)

MOBIS has a sexual harassment policy, and it is undisputed that Green received a copy of this policy on more than one occasion and also attended annual sexual harassment sessions. MOBIS's policy defines sexual harassment, prohibits, and includes the following statement on reporting sexual harassment:

**Reporting and Investigation**

Anyone who feels that he or she has been subjected to conduct

---

[1] The Court notes that Powers has denied these actions and claims that he and Green maintained a consensual relationship. However, Powers has not moved for summary judgment, and the Court credits Green's account since it must take the facts in the light most favorable to Green as the non-moving party.

4

that violates this policy has a duty to immediately report the matter. MOBIS provides multiple avenues for reporting harassment to the aggrieved Team Member's Supervisor, Department Manager, Team Relations Department, or HR. If you do not receive prompt acknowledgment of your complaint from Team Relations or HR, notify HR immediately. Early reporting and intervention have shown to be one of the most effective methods of resolving actual or perceived incidents of harassment. MOBIS will make every effort to stop alleged harassment before it becomes severe or pervasive, but can only do so with your cooperation.

Every report of perceived harassment will be fully, promptly, and impartially investigated and corrective action will be taken where appropriate. Confidentiality will be maintained throughout the investigatory process to the extent consistent with adequate investigation and appropriate corrective action. Violation of this policy will result in disciplinary action, up to and including discharge.

(Doc. #60-4, at 56.) Power Point slides used in MOBIS's sexual harassment training also stress an employee's duty to report sexual harassment as soon as possible, stating:

- If comfortable, tell the perpetrator to stop, say NO!

- If inappropriate behavior continues, notify the chain of supervision.

- If it still persists, contact human resources officials for appropriate administrative procedures.

(Doc. #60-7, at 15.)

As stated above, the policy directs employees to report sexual harassment to their "Supervisor, Department Manager, Team Relations Department, or HR." Green's Supervisor throughout her employment with MOBIS was Don Crosley ("Crosley"), and he was generally present every day throughout Green's shift. Human Resources was located in a

5

separate building.  Team Members had to schedule an appointment with Human Resources and could not access the building without the security badge of a Team Leader or someone in a more senior position.  Team Relations existed to bridge the gap between Human Resources and Team Members by being present throughout the plant on every shift.  Team Relations were responsible for taking any concerns or documents from Team Members during their shift to the Human Resources Department.

In February 2011, Green first complained of Powers's sexual harassment to Coy Kendrick ("Kendrick").  Kendrick was a Team Leader on a different shift, but Green had worked with him in the past and felt comfortable talking to him.  Team Leaders like Kendrick, however, are not among the members of management specified in MOBIS's sexual harassment policy to whom employees are directed to report sexual harassment.

On April 6, 2011, approximately three months after Powers's sexual harassment began, and during which time Green says she was sexually harassed "on almost a daily basis," (Doc. #77-1, ¶ 7), Green placed an unsigned, anonymous complaint in an UPLINK box.  UPLINK boxes were a means of communicating with management instituted by MOBIS.  MOBIS placed several locked UPLINK boxes throughout their facilities.  Employees were encouraged to place written comments in the boxes, which were then removed by members of Team Relations and taken to Human Resources.  The UPLINK comments would go to Curt Bennett ("Bennett"), who was assistant manager of Team Relations and later manager of Human Resources.  Bennett would typically type the handwritten comments from the UPLINK boxes, add a typed response from management,

6

and post the comments with management's response on a bulletin board by the UPLINK box.

Comments with names were not posted publicly, and Bennett would post comments with

responses only if appropriate. (Doc. #61-1, at 9–12.) Printed guidelines on the use of the

UPLINK boxes state that "[n]o names will ever be printed or posted," and that "[n]o

UPLINKS that ask about confidential items will be answered or posted." (Doc. #60-10, at

24.)

The anonymous comment Green placed in the UPLINK box dated April 6, 2011,

stated:

> We as the woman in the paint department is tired of the sexual
> harassment Jeremy Powers is doing. We are frighten & scared
> of Jeremy but don't know who to tell or go to. He is friend with
> Don and we are scared of losing our jobs. This has to be stop.
> We all 5 have proof. He texts things that are unapomptly. We
> talk about it with each other but no one would believe us. What
> should we do. This is coming from MOBIS employees, temps,
> and contract workers. Someone have to step up. This has to be
> investigated.

(Doc. #60-10, at 35, 41.) When the UPLINK system was first implemented, Team Relations

checked the boxes nearly every day due to the high level of employee interest. As employee

use of the UPLINK boxes tapered off, MOBIS ceased checking the boxes as frequently.

(Doc. #61-1, at 35.) As a result, MOBIS did not immediately remove Green's complaint

from April 6, 2011. Green states that she submitted a second, signed complaint about

Powers's sexual harassment, although she could not remember when or even whether she

submitted it before or after the April 6 complaint.[2] (Doc. #60-1, at 36–37, 68.) In any event, it was not until late May or early June 2011 that MOBIS received Green's April 6, 2011 anonymous complaint.[3]

When MOBIS received the anonymous complaint dated April 6, 2011, in late May or early June, it immediately posted the following revised comment and response:

> **Team Member UPLINK:**
> There is a concern regarding what steps to take when dealing with harassment in my department because I am scared of losing my job and something needs to be done and investigated.
>
> **Management Response**
> If there is ever a time that you feel like you are being harassed on the job please contact your immediate Supervisor and the Team Relations dept. If you are not comfortable talking to your Supervisor about the issue then contact Team Relations directly.

(Doc. #61-9, at 17.)   When no employee came forward in response to this post from management, Bennett and Chris Morgan ("Morgan"), Team Relations Manager, began an investigation on June 14, 2011. Bennett and Morgan interviewed several hourly employees of the Paint Department. Since Department Manager Crosley was on vacation, Powers had to escort each employee, including Green, to Human Resources. However, Powers did not know that the purpose of the interviews was to investigate his alleged sexually harassing

---

[2] MOBIS has been unable to produce any second complaint from Green and disputes that she submitted it at all. Nonetheless, at the summary judgment stage, the Court credits Green's statement that she submitted a second complaint identifying herself as the complainant.

[3] Green asserted at her deposition, for the first time, that she also reported the sexual harassment to Iveco Gibbs days before MOBIS's official June 14, 2011 investigation. Iveco Gibbs was a process technician, was not a member of management or Green's supervisor, and was not among the personnel listed in the policy to whom employees were to report sexual harassment.

conduct.

The first few employees of the Paint Department made no mention of sexual harassment by Powers. When Green was interviewed by Bennett and Morgan, she first complained only of problems with Crosley's management style. After Bennett sensed that there was something she was holding back, he asked Green if there were any other problems she would like to discuss. At that point Green admitted she had submitted the April 6, 2011 UPLINK form and claimed Powers had sent her inappropriate texts and brushed up against her. Green agreed to give her cell phone to Bennett and Morgan since it contained text messages from Powers to Green and later gave them printed copies of some of the text messages she had saved as e-mails.[4] Bennett and Morgan also interviewed Kendrick, the Team Leader Green had initially told about Powers in February 2011, who stated that Green had shown him a text message from Powers and that he had suggested Green address her concerns with Powers.

After Bennett and Morgan completed their investigation, they concluded that Powers's texts were inappropriate, although they did not believe they were sexually explicit. On the evening of June 20, 2011, Bennett and Morgan recommended to Tracy Riedler ("Riedler"), General Manager of Human Resources, that Powers be terminated. On the morning of June 21, 2011, Powers was terminated and escorted off MOBIS premises. This was one week

---

[4] None of the text messages produced as a result of the investigation contained sexually explicit images. Many of the texts were work related, and some were of a sexual nature, e.g., "Wanna come hold it . . . ha ha," "U look cute . . .," "kiss kiss."

after MOBIS began its investigation and approximately two to three weeks after MOBIS received Green's April 6, 2011 complaint from the UPLINK box.  Green also admits that Powers did not sexually harass her from the time MOBIS began its investigation on June 14 until the time it terminated Powers on June 21.

On June 21, 2011, the same day Powers was fired, Green submitted her first charge of discrimination with the Equal Opportunity Employment Commission ("EEOC").  Green charged MOBIS with sex discrimination based on Powers's sexual harassment as well as retaliation.  Green's retaliation claim was based on what she perceived as her removal from a Team Leader position following her complaints.  On April 1, 2011, Powers was promoted to Supervisor.  Powers remained on the first shift to train for the Supervisor position and also retained some of his Team Leader duties.  Green was told by Crosley that she would be "Active" or "Acting" Team Leader while Powers transitioned to the Supervisor position.  Green was not told she would receive an increase in pay, and she did not receive formal training for the Team Leader position.  She performed some, but not all, of the functions of a Team Leader, and it is common for Team Members to perform the functions of Team Leaders when necessary.  No official MOBIS documents show that Green was promoted to the Team Leader position.  An unofficial telephone directory created by a receptionist identified Green as a Team Leader, but Green identified herself as a "Paint Color Tester" on a pre-request for FMLA leave and as a "Color Code Tester" on her EEOC intake form.

During the period in which Powers was training for the Supervisor position and splitting his Team Leader duties with Green, Kendrick was offered a chance to transfer from

his second-shift Team Leader position to the first shift, which was Green's shift. Kendrick was offered this opportunity before it was posted for other employees because he was currently a Team Leader. Green continued to perform some of the duties of a Team Leader after Powers was terminated in June 2011. After the plant reopened following an extended closing for the July 4th holiday, Kendrick began acting as Team Leader for the first shift, and there was no longer any need for Green to perform any Team Leader duties for that shift. Kendrick's transfer from second to first shift created a Team Leader vacancy for the second shift, but Green did not apply for that position. Green states that Bennett told her in a meeting regarding Powers's harassment that she had never been a Team Leader, (Doc. #60-1, at 29), but Bennett denies this. (Doc. #61-9, at ¶ 31.) Regardless, it is undisputed that no official MOBIS records reveal Green was promoted to Team Leader, and she was never told she would be paid more for temporarily assuming the duties of "Acting" or "Active" Team Leader.

During the course of her employment at MOBIS, Green requested and received approval for leave under the Family Medical Leave Act ("FMLA") to take her father to doctor's visits. Under MOBIS's attendance policies, employees accrue points for unexcused absences but do not accrue points for FMLA leave. MOBIS requires employees to first substitute accrued vacation for FMLA leave. MOBIS also has a policy of confirming doctor's appointments for employees who submit copies of doctor's excuses, rather than originals, when requesting FMLA leave.

In October 2011, after Green had exhausted her accrued vacation, MOBIS received

11

a copy of a doctor's note from Extended Arm Physicians referring Green's father for an appointment with Dr. Gregory Hoffpauir on October 17–18, 2011.  Ashley Brooks ("Brooks"), MOBIS's FMLA Coordinator, noticed that the doctor's referral note for October 17–18, 2011, including handwritten portions and other unique marks, appeared identical to a note Green submitted for FMLA leave for doctor's visits on June 21–22, 2011.  Brooks called Dr. Hoffpauir's office and verified that Green was not at his office with her father on October 17–18, 2011.  It is undisputed that Green did not attend work on October 17, 2011, but instead attended a recital at her son's school.  It is also undisputed that she worked a twelve-hour shift on October 18, 2011.

On October 28, 2011, Bennett, Morgan, Plastics Division Manager Sunggoo Heo ("Heo"), and Team Relations Representative Kimberly Pinkard ("Pinkard") met with Green to advise her they were investigating what they believed were falsified doctor's notes that Green had submitted.  Green admits she remembers being asked about October 18 but does not remember whether she was asked about October 17. (Doc. #60-2, at 24–27.)  Green told Bennett, Morgan, Heo, and Pinkard in the meeting that she worked on October 18.  Green further claims that she was not shown any of the potentially falsified excuses and that she offered to provide original doctor's excuses.  However, Green has not produced original doctor's notes for the June 21–22, 2011 or the October 17–18, 2011 doctor's visits.

Green now claims that she submitted neither the June nor the October doctor's notes to MOBIS and that she has no idea how MOBIS came to have doctor's notes for her father in its possession. (Doc. #60-2, at 25–26.)  However, in his deposition, Kevin Green, Noria

Green's husband, testified that he showed his children how to forge doctor's excuses, and that Green was in bed nearby at the time. (Doc. #91-1, at 10–11.) Kevin Green states specifically that he showed his children how to black out dates on doctor's excuses to allow for the insertion of a new date, and that the children showed Noria Green the forged documents they had produced with their father's help. (Doc. #91-1, at 23.) Still, Kevin Green did not admit to personally forging the doctor's note for the October 17–18, 2011 visits and could not recall whether he had seen the October 17–18 notes, but did admit the documents he showed his children how to forge were "similar." (Doc. #91-1, at 24.)

On November 4, 2011, Green met again with Bennett, Morgan, Heo, and Pinkard to discuss the doctor's notes. Green was informed that MOBIS had verified her doctor's notes and that they believed she had provided falsified documents in requesting FMLA leave. MOBIS then informed Green that it was terminating her for falsifying doctor's excuses. It is undisputed that, had Green provided forged doctor's notes to MOBIS, this would have been grounds for termination. (Doc. #59, at 20; Doc. #78, at 22.) Green filed a second EEOC charge on December 1, 2011 alleging her termination was retaliation for her filing a June 21, 2011 charge of discrimination.

Prior to her termination, Green had applied for a mortgage with Acre Mortgage Company ("Acre"). On October 24, 2011, Acre submitted a Request for Verification of Employment to MOBIS, which MOBIS employee Monique Coleman completed and returned. The form MOBIS sent to Acre accurately reflected that Green was employed at the time and her rate of hourly pay. On January 20, 2012, after Green was initially denied a

mortgage with Acre, Acre sent a second Request for Verification of Employment to MOBIS. Coleman again completed the form and returned it to Acre. The form accurately reflected that Green was no longer employed with MOBIS. Since the verification form reflected that Green was unemployed, Acre apparently denied her a mortgage a second time.

Following her termination from MOBIS, Green sought unemployment benefits from the Alabama Department of Industrial Relations ("ADIR"). Bennett, on behalf of MOBIS, opposed Green's collection of unemployment compensation, claiming Green had been discharged for falsifying documents. ADIR initially determined Green was ineligible for benefits under Alabama Code § 25-4-78(a)(3), which disqualifies individuals from receiving unemployment if they were discharged for "a dishonest or criminal act committed in connection with [the employee's] work." Green appealed this initial determination, and a telephone hearing was held on December 16, 2011, with a representative from ADIR's Hearings and Appeals Division. Green, her counsel, and Bennett, as representative for MOBIS, were present for this telephone hearing. (Doc. #83-1, at ¶ 3.) However, the December 16 telephone hearing was continued after the ADIR hearing officer asked MOBIS to produce the documents they claimed Green had falsified. (Doc. #81, at 08:48.)[5]

The hearing was continued to January 4, 2012, but as the result of a plant shutdown over the holiday period of December 2011, Bennett did not receive notice that the hearing had been rescheduled. As a result, MOBIS was not represented at the January 4, 2012

---

[5] Doc. #81 refers to an audio recording of the January 4, 2012 ADIR telephone hearing.

appeal, and the ADIR hearing officer proceeded with the appeal in the absence of both the supporting documents from MOBIS containing the purportedly falsified doctor's excuses and a representative from MOBIS.  The hearing officer concluded that Green had not provided a note for October 17 or 18, 2011, and that Green had not committed a dishonest act that led to her discharge.  When Bennett found out that the hearing had been conducted in his absence and without the doctor's notes in question, he wrote to the Hearings and Appeals Division of ADIR seeking to appeal the January 4, 2012 appeal, but his requests for an appeal were denied.

## IV.  DISCUSSION

### A.    Green's Motions to Strike

Before turning to the merits of MOBIS's motion for summary judgment, the Court must first resolve Green's Motion to Strike the Declaration of Kevin Green (Doc. #78, at ¶ 59) and her Motion to Strike Defendant's Supplemental Evidentiary Submission (Doc. #92).

### 1.    Declaration of Kevin Green

Green moves to strike Kevin Green's declaration as a sham on the grounds that he repudiates the testimony given in his declaration in his subsequent deposition.  In *Tippens v. Celotex Corporation*, the Eleventh Circuit stated the criterion for when an affidavit or declaration should be stricken as a sham.  805 F.2d 949 (11th Cir. 1986).  Where statements in an affidavit are "inherently inconsistent" with deposition testimony, the statements in the affidavit may be stricken as a sham.  805 F.2d at 953–54.  But where the discrepancies between the affidavit and deposition do not create "irreconcilable conflict," the affidavit is

15

not stricken, and the inconsistencies create an issue of credibility or go to the weight of the evidence, with such issues resolved in favor of the non-moving party at summary judgment. *Id.; see also Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987) ("Thus, our cases require a court to find some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit."). The Court finds that three key paragraphs of Kevin Green's declaration are inherently inconsistent with statements made in his subsequent deposition, and, therefore, they must be stricken as a sham.

In paragraph three of his declaration, Kevin Green states of the doctor's note that led to Green's discharge, "I showed her how to remove (blank out) dates from a medical excuse for an earlier absence so she could replace those dates with dates including October 17, 2011, when she was absent." (Doc. #61-13, at ¶ 3.) The same paragraph also states that the October 17–18, 2011 doctor's note is the one Kevin Green showed Noria Green how to forge. However, in his subsequent deposition, Kevin Green testified that he showed his children how to forge doctor's excuses, that Green was lying in bed in an adjoining room, and that Green's children showed her some of the forged documents. (Doc. #91-1, at 10–11, 23.) He further testified in his deposition, "I never showed Noria anything." (Doc. #91-1, at 13.) Finally, Mr. Green testified that he did not specifically recall seeing the doctor's notes for June 21–22 and October 17–18, 2011, but that the documents he showed his children to alter were "similar." (Doc. #91-1, at 24.) The Court finds this deposition testimony to be inherently inconsistent with Kevin Green's statements in paragraph three of his declaration that he directly showed Noria Green how to change dates on doctor's notes

16

and that he specifically recalled helping her alter the October 17–18, 2011 doctor's notes.

In paragraph five of his declaration, Kevin Green states he showed Noria Green how to alter a 401(k) distribution notice from MOBIS to conceal the fact that she had been terminated before she sent it to Acre as part of her mortgage application. (Doc. #61-13, at ¶ 5.) However, in his deposition, Kevin Green testified, "I never touched no mortgage," and that he did not personally show Green how to forge documents in connection with her mortgage application. (Doc. #91-1, at 13.) The Court likewise finds these statements inherently inconsistent with the statements of paragraph five of the declaration.

In paragraph six of his declaration, Kevin Green states that he falsely denied changing the doctor's excuses and the 401(k) form to Noria Green's law firm, and that making the false statements was "a mistake which I could not live with." (Doc. #61-13, at ¶ 6.) He goes on to state that he contacted a paralegal at Noria Green's law firm and told her he had lied and that Green's law firm has asked him to change his story since then but he has not. In his deposition, Kevin Green read paragraph six of his own declaration out loud and stated, "That's a lie. That's just a blatant lie. I'm not going to sit here and accept that." (Doc. #91-1, at 13.) Kevin Green's explicit repudiation of his own declaration during his deposition is inherently inconsistent with paragraph six of his declaration. Indeed, Kevin Green testified on several occasions that he *did not even read his own declaration before signing it*. (Doc. #91-1, at 5, 22, 30.) Accordingly, Green's Motion to Strike the Declaration of Kevin Green (Doc. #78) is GRANTED, and paragraphs 3, 5, and 6 of Kevin Green's declaration (Doc.

#61-13) are hereby STRICKEN.[6]  These statements played no part in the Court's earlier statement of undisputed facts.

## 2.    Defendant's Supplemental Evidentiary Submission

Green has also filed a Motion to Strike Defendant's Supplemental Evidentiary Submission (Doc. #92).  Green objects to MOBIS's submission of an audio recording of the January 4, 2012 telephone hearing with ADIR on the grounds that the new evidence was presented too late and was not previously disclosed by MOBIS.  The purpose of the submission of the audio recording with MOBIS's supply brief was to refute Green's argument, introduced for the first time in her brief in opposition to summary judgment, that ADIR's finding that Green did not commit misconduct collaterally estopped MOBIS from claiming Green was terminated for falsifying doctor's notes.  The Court finds that Green's motion to strike is due to be denied.

First, there is no rule prohibiting MOBIS from submitting additional evidence in support of its reply brief–especially when such evidence is introduced to respond to an argument made for the first time by Green in her opposition brief.  Such supplemental evidentiary submissions are routine in this Court and district courts throughout the Eleventh Circuit, and to suggest MOBIS is violating a rule of law or court order is disingenuous.  *See, e.g.*, *Hegre v. Alberto-Culver USA, Inc.*, 508 F. Supp. 2d 1320, 1327–28 (S.D. Ga. 2007).

---

[6] The Court does not strike paragraph four, which states that Noria Green gave the doctor's notes in question to MOBIS, but disregards it since it is not based on Kevin Green's personal knowledge.

The audio recording of the ADIR hearing and supplemental declaration of Bennett did not introduce new claims or theories by MOBIS to which Green could not respond, but rather were introduced to respond to the claim that MOBIS was collaterally estopped by an administrative hearing in which it did not even participate.

Second, Green argues that MOBIS failed to supplement their disclosures to include the audio recording under Federal Rule of Civil Procedure 26(e), and that MOBIS is consequently barred from using the evidence pursuant to Rule 37.  Rule 26(e) requires parties to supplement disclosures if "the party learns that in some material respect the disclosure or response is incomplete or incorrect, *and if the additional or corrective information has not otherwise been made known to the other parties during the  discovery process* . . . ."  Fed R. Civ. P. 26(e)(1)(A) (emphasis added).   In this case, the "additional or corrective information," namely the audio recording of the ADIR hearing, was "otherwise made known" to Green during the discovery process.   This is because counsel for Green participated in the hearing itself and because Green produced the ADIR records to MOBIS.   Green can hardly claim to be unaware of a record of a hearing in which she and her counsel participated.

Even assuming MOBIS had failed to supplement its disclosures in violation of Rule 26(e), it would be fundamentally unfair to prevent MOBIS from introducing evidence that it was not represented at the ADIR telephone hearing in response to Green's false statement that MOBIS was represented at the hearing.  *See Murphy v. Magnolia Elec. Power Ass'n*, 639 F.2d 232, 234–35 (5th Cir. Mar. 12, 1981) (holding it was reversible error to prevent

19

plaintiff's expert witness from testifying in rebuttal to defense's witness even though plaintiffs failed to disclose witness in violation of Rule 26(e)).[7]  Green's *sworn declaration* contains the following statement: "The Hearings and Appeals Division of the DIR conducted a hearing of my appeal on January 4, 2012 *and MOBIS was present*." (Doc. #77-1, ¶ 50) (emphasis added).  The statement that MOBIS was present at the telephone hearing is completely false, as the audio recording makes clear; indeed, the hearing officer attempts to contact Bennett three times and fails due to the plant shutdown.  The hearing officer then proceeds with the appeal without MOBIS's participation and without having received the doctors' notes MOBIS claimed Green falsified.  (Doc. #81, at 10:05.)

Incredibly, Green and her counsel were present at the telephone hearing, which was clearly conducted in MOBIS's absence, and yet Green's sworn declaration states that MOBIS was present at the hearing.  Even more incredibly, Green seeks to strike MOBIS's submission of the audio recording that would prove Green's statement to be false.  Green essentially asks this Court to give the ADIR hearing issue preclusive effect against MOBIS on the basis of Green's false statement that MOBIS was represented at the hearing and, further, to prevent MOBIS from presenting evidence demonstrating Green's falsehood.  The position Green's counsel has taken on the January 4, 2012 ADIR hearing proves the truth of Benjamin Franklin's maxim, "Half the truth is often a great lie."  The Court declines to

---

[7] In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. Nov. 3, 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

further perpetuate or condone such conduct.   Accordingly, Green's Motion to Strike Defendant's Supplemental Evidentiary Submission (Doc. #92) is DENIED.

**B.     MOBIS's Motion for Summary Judgment**

Green brings claims against MOBIS under Title VII for sexual harassment (Count 1), gender discrimination (Count 2), and retaliation (Count 3).  (Doc. #42.)  She also brings claims against MOBIS under the Equal Pay Act (Count 8), and the Family and Medical Leave Act (Count 9).   Green asserts state law claims against both Powers and MOBIS for negligent and wanton hiring/training (Count 4), invasion of privacy (Count 5), assault and battery (Count 6), and intentional infliction of emotional distress (Count 7).   MOBIS has moved for summary judgment as to all claims against it.  (Doc. #58.)  Powers has not moved for summary judgment.

**1.     Sexual Harassment**

Green alleges both quid pro quo and hostile work environment sexual harassment claims against MOBIS.  (Doc. #42, at ¶¶ 43–57.)  However, Green does not allege that Powers engaged in any quid pro quo sexual harassment in her Amended Complaint, and in her deposition, Green conceded that Powers never offered to give or withhold benefits from her in exchange for sexual favors.  *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753 (1998) ("When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII.").  Accordingly, summary judgment is GRANTED in favor of

MOBIS as to Green's quid pro quo sexual harassment claim in Count 1 of the Amended Complaint. This leaves Green's claim of sexual harassment based on Powers's creation of a hostile work environment.

Title VII prohibits sex-based discrimination that alters the terms and conditions of employment. 42 U.S.C. § 2000e2(a)(1). Title VII's prohibition of sex discrimination includes sexual harassment based on actions that create a hostile work environment. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245–46 (11th Cir. 1999) (citing *Meritor Savs. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). To establish a hostile work environment, an employee must show that the harassing conduct was sufficiently severe or pervasive to alter the employee's terms or conditions of employment. *Mendoza*, 195 F.3d at 1246 (citation omitted). The employee must subjectively perceive the conduct as severe and pervasive, and this perception must also be objectively reasonable, i.e., the environment must be one that a reasonable person would find hostile or abusive. *Id.* (quotation and citation omitted). Since the Court finds that MOBIS is entitled to summary judgment on an affirmative defense, the Court makes no finding concerning whether Powers's harassment of Green was subjectively and objectively severe and pervasive sufficient to alter the terms and conditions of her employment.

Where, as here, the employer's liability is based on the creation of a hostile work environment by the plaintiff's co-worker or supervisor,[8] the employer may avoid liability

---

[8] "The supervisor does not have to be the harasser for this kind of sexual harassment to occur, although experience has proven that he often will be." *Hulsey v. Pride Rests., LLC*, 367 F.3d 1238,

under the *Faragher-Ellerth* affirmative defense.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807–08 (1998); *Ellerth*, 524 U.S. at 765.  An employer may avoid liability for an employee's sexual harassment if the employer proves the following two elements by a preponderance of the evidence: (1) that the employer exercised reasonable care to prevent and to correct promptly any sexually harassing behavior; and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  *Ellerth*, 524 U.S. at 765.  A demonstration of an employee's failure to reasonably follow the employer's complaint procedure "will normally suffice to satisfy the employer's burden under the second element of the defense." *Id.*

The first element of the *Faragher-Ellerth* defense requires the employer to exercise reasonable care to prevent and to promptly correct sexual harassment.  An employer shows that it has exercised reasonable care to prevent sexual harassment by disseminating a sexual harassment policy with reasonable complaint procedures.  *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1314 (11th Cir. 2001).  It is undisputed that MOBIS disseminated its policy.  Green received the policy at least three times during the course of her employment with MOBIS and also received annual sexual harassment training.  MOBIS's policy also contains reasonable complaint procedures.  A policy contains reasonable complaint

---

1245 (11th Cir. 2004).  Powers was a non-supervisory Team Leader from January through April 2011, and a Supervisor from April through June 2011, during which time he sexually harassed Green.

procedures if it provides alternative avenues to report sexual harassment in the event the harasser is an employee's supervisor. *See Madray v. Publix Supermkts., Inc.*, 208 F.3d 1290, 1298 (11th Cir. 2000) (finding policy complied with EEOC guidelines by providing alternative avenues to employees for lodging a complaint other than the harassing supervisor). MOBIS's policy defines sexual harassment, prohibits it, and instructs employees to promptly report sexual harassment "to the aggrieved Team Member's Supervisor, Department Manager, Team Relations Department, or HR." (Doc. #60-4, at 56.) MOBIS's policy thus provides alternative avenues for reporting harassment. As a result of its policy, MOBIS took reasonable care to prevent sexual harassment.

The first element of the *Faragher-Ellerth* defense also requires employers to promptly correct sexual harassment once the employer becomes aware of it. Once MOBIS became aware of the April 6, 2011 anonymous complaint about Powers in late May or early June 2011, it immediately posted a response on the bulletin board by the UPLINK box reminding employees to report sexual harassment to their Supervisor or Team Relations. (Doc. #61-9, at 17.) When no response followed, Bennett and Morgan began interviewing random employees from the Paint Department on June 14, 2011. Even when Green was interviewed, she did not discuss Powers sexual harassment until Bennett asked her if there was anything else she would like to discuss. After Green revealed Powers's text messages and inappropriate touching to Bennett and Morgan, Powers was investigated and terminated within one week. The Court finds that MOBIS took prompt corrective action upon the discovery of the April 6, 2011 complaint in late May or early June by posting the notice of

24

how to properly report harassment, subsequently interviewing members of the Paint Department, and then investigating and terminating Powers, all within the course of three to four weeks.

Green argues that MOBIS did not take prompt corrective action to correct Powers's sexual harassment because it did not receive her April 6 UPLINK complaint until late May or early June. The question of whether an employer timely acted to correct harassment turns on when it had proper notice of an employee's harassment complaint. *Frederick*, 246 F.3d at 1315. And the question of when an employer has notice of an employee's harassment complaint in turn depends on when the employee reported the complaint according to the procedures specified by the employer. *See Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1364 (11th Cir. 1999) ("With this policy, Sundor itself answered the question of when it would be deemed to have notice of the harassment sufficient to obligate it or its agents to take prompt and appropriate remedial measures. Our task is thus to determine whether [the plaintiff] made reasonably sufficient use of the channels created by Sundor's policy to put Sundor on notice of the ongoing harassment."). MOBIS's policy states that an employee subjected to sexual harassment "has a duty to immediately report the matter. MOBIS provides multiple avenues for reporting harassment to the aggrieved Team Member's Supervisor, Department Manager, Team Relations Department, or HR. *If you do not receive prompt acknowledgment of your complaint from Team Relations or HR, notify HR immediately*." Placing an anonymous complaint in a dropbox is not a means of "immediately" reporting sexual harassment, and the policy further requires employees to

notify HR if they do not receive a "prompt acknowledgment" of their complaint.  Even if it is true that Green placed a second, signed complaint in the UPLINK box, this was not a reasonable way of notifying HR.  MOBIS never specified that the UPLINK system could be used to report sexual harassment or stated that the UPLINK boxes would be checked with frequency.  By contrast, Green's Supervisor and members of Team Relations were present on the floor every day and were available to receive complaints of sexual harassment, yet Green made no complaints to them.  MOBIS cannot be blamed for Green's choice to report sexual harassment by means of an anonymous complaint placed in a dropbox, and it indisputably acted promptly once it received the complaint.

Even if there were shortcomings in MOBIS's investigation into Green's anonymous complaint, the Eleventh Circuit has held that "even if the process in which an employer arrives at a remedy in the case of alleged sexual harassment is somehow defective, the [*Faragher-Ellerth*] defense is still available if the remedial result is adequate . . . In other words, a reasonable result cures an unreasonable process."  *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1305 (11th Cir. 2007).  A remedial measure is adequate if it is "reasonably likely to prevent the misconduct from recurring."  *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996) (quotation and citation omitted).  Here, given that Green chose to complain by anonymous complaint submitted in a dropbox, any shortcomings in MOBIS's investigation were overcome by the remedial measures it took.  Green concedes that Powers did not harass her during the time that MOBIS investigated him, and terminating Powers was clearly "reasonably likely to prevent the misconduct from

recurring." *Kilgore*, 92 F.3d at 754.   Therefore, because the Court finds that MOBIS exercised reasonable care to prevent and to promptly correct sexual harassment, MOBIS has met the first element of the *Faragher-Ellerth* defense.

The second element of the *Faragher-Ellerth* defense requires MOBIS to show that Green unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Ellerth*, 524 U.S. at 765.   While the Court recognizes the seriousness of Green's sexual harassment claims, a careful reading of Eleventh Circuit precedent applying the *Faragher-Ellerth* defense persuades the Court that Green unreasonably failed to follow the MOBIS's corrective measures.   First, where an employer's sexual harassment policy enumerates specific members of management to whom employees must report harassment, an employer is not on notice of an employee's harassment if the employee reports the harassment to members of management not specified in the policy.   *See Madray v. Publix Supermkts., Inc.*, 208 F.3d 1290, 1300 (11th Cir. 2000); *Breda v. Wolf Camera & Video*, 222 F.3d 886, 889–90 (11th Cir. 2000); *Coates*, 164 F.3d at 1364.   Second, where an employer's sexual harassment policy requires employees to promptly report sexual harassment, a delay of two-and-a-half to three-and-a-half months, absent exceptional circumstances, is unreasonable as a matter of law.   *See Baldwin,* 480 F.3d at 1307; *Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1289–91 (11th Cir. 2003).

The *Madray* case illustrates that employees must report sexual harassment to the personnel specified in the employer's policy.   The policy in *Madray* required employees to report sexual harassment to their Store Manager, District Manager, or Divisional Personnel

Manager.  208 F.3d at 1294.  The employees in *Madray* informed two mid-level managers

of their Store Manager's sexual harassment, and a third mid-level manager even witnessed

an instance and told the offending Store Manager, "That's sexual harassment."  *Id.* at 1293.

The Eleventh Circuit held that Publix was not on notice of the sexual harassment as a result

of these reports to mid-level managers not specified in the policy:

> However, as we have noted, once an employer has promulgated
> an effective anti-harassment policy and disseminated that policy
> and associated procedures to its employees, then it is incumbent
> upon the employees to utilize the procedural mechanisms
> established by the company specifically to address problems and
> grievances . . . Therefore, we conclude that Publix cannot be
> considered to have been placed on notice of [the Store
> Manager's] harassing behavior by the plaintiffs' informal
> complaints to individuals not designated by Publix to receive or
> process sexual harassment complaints.

*Id.* at 1300 (quotation and citation omitted).  *See also Frederick*, 246 F.3d at 1315–17

(remanding to district court for a finding of whether policy was in place requiring employees

to report to supervisor or Human Resources or whether policy was in place allowing

employees to report to "another member of management with whom [she is] comfortable"

and holding such a finding was dispositive of whether employee reasonably followed

employer's reporting procedures); *Breda*, 222 F.3d at 889–90 (holding employer was on

notice of sexual harassment once store manager was aware of it since employees were

directed to report harassment to store managers or the Personnel Department).  The policy

of requiring employee adherence to an employer's reporting procedures is based on the

recognition that "the problem of workplace discrimination . . . cannot be [corrected] without

28

the cooperation of the victims, notwithstanding that it may be difficult for them to make such efforts." *Coates,* 164 F.3d at 1366.

These cases make clear that Green's attempts to report harassment were unreasonable insofar as she attempted to report sexual harassment to personnel not specified in MOBIS's policy. MOBIS's sexual harassment policy requires employees to report harassment to "the aggrieved Team Member's **Supervisor**, **Department Manager**, **Team Relations Department**, or **HR**." (Doc. #60-4, at 56) (emphasis added). This policy enumerates members of management to whom employees must report harassment, just as the policy in *Madray*, and it is similar to other policies the Eleventh Circuit has upheld as reasonable because it includes alternative members of management with whom an employee may communicate. Green endured Powers's harassment for nearly a month before she discussed the problem with Team Leader Kendrick in February 2011. Team Leaders are not members of management and are not listed in the policy as individuals to whom sexual harassment can be reported. Therefore, MOBIS was not on notice of Powers's harassment of Green in February 2011. On April 6, 2011, two months after her conversation with Kendrick, and three months after the sexual harassment began, Green placed an anonymous complaint in the UPLINK box.[9] The UPLINK boxes were checked by members of Team Relations, who were among the members of management specified in the policy to whom sexual harassment

---

[9] Approximately two months later, Green expressed her concerns to Iveco Gibbs, a process technician who was neither a member of management nor designated to receive complaints in the policy. MOBIS was not put on notice of Green's harassment by this complaint either.

could be reported.  But, as discussed above, the policy requires employees to "immediately" report sexual harassment and to immediately report to HR if they do not receive a "prompt acknowledgment" of their complaint.  Thus, even if Green was reasonable in using the UPLINK box as a means of reporting sexual harassment to management, she waited too long to complain.

In *Baldwin*, the court affirmed summary judgment in favor of the employer holding that the plaintiff's failure to report the sexual harassment sooner established the second element of the *Faragher-Ellerth* defense.  480 F.3d at 1306.  Like MOBIS's policy, the policy in *Baldwin* required employees to report sexual harassment "immediately."  *Id*.  The plaintiff in *Baldwin* reported the sexual harassment a little over three months after she was propositioned by her manager, and the court held that this was "anything but prompt, early, or soon."  480 F.3d at 1307.  The *Baldwin* court cited *Walton* in support of its conclusion.  In *Walton*, the plaintiff waited two-and-a-half months before reporting sexual harassment, and the court likewise held that this delay established the unreasonableness of the employee's conduct as required by the second element of the *Faragher-Ellerth* defense.  347 F.3d at 1289–91.  The policy behind shielding employer's from Title VII liability when an employee delays reporting harassment is that "most, if not all, of the actionable harassment" of the plaintiff could have been avoided through prompt reporting.  *Id*. at 1290.  As the *Baldwin* court states: "The *Faragher* and *Ellerth* decisions present employees who are victims of harassment with a hard choice: assist in the prevention of harassment by promptly reporting it to the employer, or lose the opportunity to successfully prosecute a Title VII claim based

on the harassment."  480 F.3d at 1307.

Green waited three months to report sexual harassment to MOBIS in a way that did not even comply with MOBIS's complaint procedures.  Green reports that Powers's harassment began in January 2011, but she did not place her anonymous complaint in the UPLINK box until April 6, 2011.  Even assuming Green's method of reporting harassment through the UPLINK system was reasonable, her delay of three months was unreasonable under the *Baldwin* and *Walton* decisions, and her delay establishes the second element of the *Faragher-Ellerth* defense for MOBIS.

Green states that she did not report the harassment to her Supervisor, Don Crosley, because Crosley was friends with Powers and she was afraid of retaliation.  (Doc. #60-1, at 61.)  She also stated that she did not report the harassment because she was afraid no one would believe her.  (Doc. #60-1, at 67.)  These reasons are insufficient to justify Green's delay in promptly reporting sexual harassment.  Crosley's purported friendship with Powers is irrelevant because MOBIS's sexual harassment policy provided alternative channels for Green to report the harassment, namely to Team Relations or HR.  Further, Green's fears that she would suffer retaliation and that no one would believe her are not based on any objective evidence and do not excuse her delay in reporting the harassment.  The Eleventh Circuit has stated that "subjective fears of reprisal do not excuse" an employee's failure promptly to report sexual harassment.  *Walton*, 347 F.3d at 1290–91.  Otherwise, "[e]very employee could say . . . that she did not report the harassment earlier for fear of losing her job or damaging her career prospects."  *Baldwin*, 480 F.3d at 1307.  An employee has good reason

to delay promptly reporting sexual harassment only in "extreme cases." *Id.* (citing *Frederick*, 246 F.3d at 1314).   In *Frederick*, there were disputed issues of fact about what sexual harassment policy was in place that affected whether the employee was reasonable in delaying her report of sexual harassment.   In addition, the employee stated that when she complained about the harassment to the supervisor, he told her not to file a report to Human Resources.   246 F.3d at 1316.   Green can point to no circumstances, such as those in *Frederick*, that justify her delay in reporting harassment.   Her subjective fears of retaliation are simply insufficient.   Thus, the Court finds that MOBIS has established both elements of the *Faragher-Ellerth* defense because MOBIS took reasonable care to prevent and to promptly correct Powers's sexual harassment and because Green unreasonably failed to use MOBIS's preventive measures or to avoid harm.   Therefore, summary judgment is GRANTED in favor of MOBIS as to Green's sexual harassment claim in Count 1 of the Amended Complaint (Doc. #42).

### 2.      Gender Discrimination and Equal Pay Act

Green asserts Title VII gender discrimination (Count 2) and an Equal Pay Act violation (Count 8) against MOBIS.   To establish a prima facie case of disparate treatment, Green must show that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly-situated male employees more favorably; and (4) she was qualified to do the job.   *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) (citation omitted).   To establish a prima facie case under the Equal Pay Act, Green must show that "an employer pays different wages to employees of opposite sexes for

equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed in similar working conditions." *Waters v. Turner, Wood & Smith Ins. Agency, Inc.*, 874 F.2d 797, 799 (11th Cir. 1989) (internal quotation and citation omitted).

Green's gender discrimination and Equal Pay Act claims are both based on her assertion that she was promoted to Team Leader but did not receive additional pay. Green's claims are without merit because the undisputed facts show that Green was never promoted to Team Leader, and, therefore, she was not entitled to any increase in pay. When Powers was promoted to Supervisor in April 2011, Green performed some of the duties of a Team Leader while Powers trained for the Supervisor position. After Powers was terminated, Green was asked to be "Acting" or "Active" Team Leader. Green continued to perform some Team Leader functions until Kendrick transferred from the second shift Team Leader position to the first shift Team Leader position. There is no position at MOBIS for "Acting Team Leader," and Green was not told she would receive increased pay. It is common for MOBIS Team Members to perform the functions of Team Leaders when necessary. No official MOBIS documents show that Green was promoted to the Team Leader position. An unofficial telephone directory created by a receptionist identified Green as a Team Leader, but Green identified herself as a "Paint Color Tester" on a pre-request for FMLA leave and as a "Color Code Tester" on her EEOC intake form. The undisputed evidence thus shows that Green was informally asked to perform some of the functions of a Team Leader for a limited time but that she was never promoted to Team Leader.

Since Green was never a Team Leader, there was no adverse employment action or pay disparity by MOBIS.  MOBIS cannot be liable for failing to pay Green for a promotion she never received.  Therefore, summary judgment is GRANTED in favor of MOBIS on Green's gender discrimination and Equal Pay Act claims in Counts 2 and 8 of the Amended Complaint.[10]

### 3.      Retaliation

Green asserts a Title VII retaliation claim against MOBIS (Count 3) based on her alleged removal from a Team Leader position, alteration of some of her paper work, her termination for allegedly providing falsified doctor's notes in connection with her request for FMLA leave, and the paperwork MOBIS gave to Acre Mortgage that resulted in a denial of Green's mortgage.[11]

#### a.      Green's collateral estoppel argument

Before addressing the merits of Green's retaliation claim, the Court must first address Green's argument that ADIR's finding that Green's termination from MOBIS was not the result of her misconduct has preclusive effect in this case.

Federal courts must give a State administrative agency's findings the same preclusive

---

[10] Green also points to documents that were supposedly altered as a basis for her gender discrimination claim.  (Doc. #42, ¶¶ 33–38; Doc. #78, at 94.)  Green has been able to produce only a Power Rinse Check Sheet with a male co-worker's name on it.  Further, Green was never disciplined for any alteration of paperwork that may have occurred.  As a result, the alteration of paperwork was not an adverse employment action.

[11] Green has abandoned her claim of retaliation based on an April 2011 work assignment requiring her to go to a lot at a Hyundai manufacturing facility to ensure the cars' bumpers matched the color of the car.  (Doc. #78, at 23.)

34

effect to which it would be entitled in the State's courts. *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986). Under Alabama law, a finding by ADIR that an employee was discharged for misconduct connected with the employee's work can have preclusive effect against an employee in subsequent litigation against an employer. *Wal-Mart Stores, Inc. v. Smitherman*, 743 So. 2d 442 (Ala. 1999), *overruled on other grounds by Ex parte Rogers*, 68 So. 3d 773 (Ala. 2010). However, the Alabama Court of Civil Appeals has held that a finding by ADIR that an employee did *not* engage in misconduct does not have preclusive effect against an employer in subsequent litigation. *Hale v. Hyundai Motor Mfg., Ala., LLC*, 86 So. 3d 1015, 1024–25 (Ala. Civ. App. 2012). This is because there is no identity of issues when an employee uses a finding of no misconduct by ADIR to support a retaliatory discharge claim. There is no identity of issues because a finding by ADIR that an employee was not discharged for misconduct *for the purposes of the unemployment compensation statute* does not compel the conclusion that the employer had no good reason for firing an employee. *Id.* That is, an employer may have reasonable grounds for discharging an employee that fall below the threshold necessary to constitute "misconduct" in the unemployment benefits context. Thus, Green cannot use ADIR's finding that she was not discharged for work-related misconduct to preclude MOBIS from arguing that she was discharged for misconduct in this litigation.

Even if Green could use ADIR's finding for the purposes of collateral estoppel, her argument fails because the reason for Green's discharge was not actually litigated before ADIR since MOBIS was not present at the hearing. An issue raised in an Alabama State

administrative proceeding has preclusive effect if all of the following elements are met: (1) there is identity of the parties or their privies; (2) there is identity of issues; (3) the parties had an adequate opportunity to litigate the issues in the administrative proceeding; (4) the issues to be estopped were actually litigated and determined in the administrative proceeding; and (5) the findings on the issues to be estopped were necessary to the administrative proceeding. *Ex parte Shelby Med. Ctr., Inc.*, 564 So. 2d 63, 68 (Ala. 1990). As a review of the audio recording of the January 14, 2012 ADIR hearing makes clear, the third and fourth elements are not met because MOBIS was not present at the telephone hearing and had not yet submitted the doctor's notes that formed the basis for its termination of Green to the hearing officer. MOBIS's plant was closed for the holiday period, and Bennett did not receive notice of the January 4, 2012 hearing. The hearing was conducted with the participation of only the hearing officer, Green, and Green's counsel. Therefore, ADIR's finding that Green did not engage in work-related misconduct does not have preclusive effect in this case.

### b.    Retaliation

To establish a prima facie case of retaliation under Title VII, a plaintiff must demonstrate: (1) that he engaged in statutorily protected activity; (2) that he suffered an adverse employment action; and (3) that the adverse employment action was causally related to the protected activity. *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998). In the context of a retaliation claim, an adverse employment action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008) (quoting

36

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 (2006)).  The Supreme Court recently held that causation for Title VII retaliation claims "must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m)," which requires only that the protected characteristic is "a motivating factor" behind the adverse employment action.  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).  That is, the employee's engaging in statutorily protected activity must be the but for cause of the employer's adverse employment action.[12]  If the employee establishes a prima facie case of retaliation, then the burden shifts to the employer to produce legitimate reasons for the adverse employment action.  *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 (11th Cir. 2001).  If the employer does so, the employee must then show that the reasons given by the employer were pretextual.  *Id*.

---

[12] The Court does not believe that the causation standard for Title VII retaliation claims in *Simmons v. Camden County Board of Education* and its progeny remain good law in the wake of *Nassar*.  In *Simmons*, the Eleventh Circuit stated a plaintiff satisfies the causation requirement for a Title VII retaliation claim with something less than but for causation:

> We do not construe the "causal link" in [the Title VII retaliation] formula to be the sort of logical connection that would justify a prescription that the protected participation in fact prompted the adverse action . . . Rather, we construe the "causal link" element to require merely that the plaintiff establish that the protected activity and the adverse action were not wholly unrelated.

757 F.2d 1187, 1189 (11th Cir. 1985).  *See also E.E.O.C. v. Reichhold Chems., Inc.*, 988 F.2d 1564, 1571–72 (11th Cir. 1993) ("This court has interpreted the causal link requirement [for retaliation claims] broadly; a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.") (citing *Simmons*); *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998) (same) (citing *Reichhold*); *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277–78 (11th Cir. 2008) (same) (citing the previous three cases); *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1260 (11th Cir. 2012) (same) (citing *Goldsmith* and *Olmsted*).

Green cannot establish a prima facie retaliation claim based on her "removal" from the Team Leader position.  As discussed above, Green was never promoted to Team Leader, and thus never "removed" from the position of Team Leader when Kendrick replaced Powers as Team Leader for the first shift in July 2011.  Green temporarily performed some Team Leader duties until Powers could be replaced.  The "removal" of a promotion one never received does not constitute an adverse employment action for purposes of Green's retaliation claim.

Green next claims that she was retaliated against by "being watched," having her work "scrutinized," and having documents altered.  (Doc. #78, at 65.)  Green's evidence of being scrutinized is based on an UPLINK complaint she submitted in August 2011, two months after Powers was terminated and after the filing of her EEOC charge on June 21, 2011, in which she stated a supervisor was watching her and a co-worker, Patrick Moore, and was criticizing their performance.  (Doc. #60-10, at 36.)  Notes from MOBIS's investigation reveal the incident to be nothing more than ordinary workplace conflict.  (Doc. #60-11, at 39–42.)  Further, to the extent there were any, the altered documents resulted in no discipline for Green.  Green also has no evidence, nor does she assert, that the people altering the documents were aware of her complaints about Powers's sexual harassment.  Green has been able to produce only a Power Rinse Check Sheet with Patrick Moore's name on it rather than hers.  None of these incidents are sufficiently adverse to prevent a reasonable employee from opposing unlawful discrimination, and, therefore, Green fails to make a prima facie case of retaliation.  *See Burlington*, 548 U.S. at 68 ("An employee's decision to report discriminatory

38

behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.").

Green's principal retaliation claim concerns her allegation that she did not submit the falsified doctor's notes that served as the basis for termination, but that MOBIS's FMLA Coordinator received the excuses from "an unknown source" who presumably "wanted Green fired" because "Green was causing too much trouble." (Doc. #78, at 66.) It is undisputed that MOBIS had in its possession copies of doctor's notes for appointments with Green's father's physicians for June 21–22, 2011, and October 17–18, 2011. It is undisputed that Green was not with her father at the doctor on those days. It is evident from viewing the doctor's notes in question that a reasonable person would believe the October notes were identical copies of the June notes with only the dates having been changed. This is how it appeared to Ashley Brooks, MOBIS's FMLA coordinator, who then verified that Green was not at the doctor with her father on those dates and reported the results of her investigation to Bennett. Brooks had no knowledge of Green's complaints of sexual harassment, and therefore could not have been motivated by a desire to retaliate against Green. (Doc. #61-5, at ¶ 20.) Moreover, it is undisputed that, if Green did submit falsified doctor's notes to MOBIS, MOBIS's termination of Green would have been justified and made on the basis of non-retaliatory reasons.

Green claims that she did not submit either the June 2011 or the October 2011 notes to MOBIS, that she does not know how MOBIS came to possess the notes, and she suggests that they were fabricated by MOBIS to serve as a pretext for firing her. Green thus asks the

Court to ignore the obvious conclusion and find a triable issue of fact on whether MOBIS fabricated doctor's notes to retaliate against Green four months after she complained of sexual harassment and four months after Powers was terminated.  While it is true that a court may not make credibility determinations at the summary judgment stage and must draw all inferences in favor of the non-moving party, the Court does not believe that the summary judgment standard so dulls common sense as to require it to ignore the obvious.

While the Court makes no judgment about Green's credibility, the undisputed evidence establishes that MOBIS received what it reasonably and honestly believed to be forged doctor's notes from Green and terminated her accordingly.  *See E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000) (holding that employer's good faith belief that employee had lied in an internal investigation constituted a legitimate non-retaliatory reason for terminating employee regardless of whether employee had actually engaged in misconduct).  Green would have the Court believe that MOBIS acquired an official doctor's referral note from her father's physician, filled it out for June 21–22, 2011 and placed it in Green's file on June 29, 2011,[13] then waited *four months* after Green's complaint of sexual harassment to retaliate against her by forging the October 17–18, 2011 doctor's referral note as a pretext to terminate her.  Green has absolutely no evidence for this conspiracy theory, and mere speculation is not sufficient to overcome summary judgment.  *See Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1318 (11th Cir. 2011) (stating that

---

[13] The June note was stamped "Received June 29, 2011" by Brooks.  (Doc. #61-5, at 21.)

"'evidence' consisting of one speculative inference heaped upon another" was "entirely insufficient" to overcome summary judgment); *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.") (quoting *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 931–32 (7th Cir. 1995)).   Accordingly, the undisputed evidence shows that MOBIS terminated Green for a non-retaliatory reason, namely, its good faith belief that she submitted falsified doctor's notes.

Finally, Green alleges that MOBIS retaliated against her by informing Acre Mortgage that she was no longer employed, which resulted in the denial of her mortgage.  As alleged in the Amended Complaint, Green claims MOBIS initiated contact with Acre for the purpose of retaliating against her by preventing her from getting a mortgage. (Doc. #42, at ¶ 65.) But the facts prove otherwise.  Acre initiated contact with MOBIS on October 24, 2011, when it submitted a Request for Verification of Employment to MOBIS, which MOBIS employee Monique Coleman completed and returned to Acre.   The form MOBIS sent to Acre accurately reflected that Green was employed at the time and her rate of hourly pay.  On January 20, 2012, after Green was initially denied a mortgage with Acre, Acre sent a second Request for Verification of Employment to MOBIS.  Coleman again completed the form and returned it to Acre.  The form accurately reflected that Green was no longer employed with MOBIS.  Since the verification form reflected that Green was unemployed, Acre apparently denied her a mortgage a second time.  In sum, MOBIS responded truthfully to Acre's requests for information, which is not an adverse employment action.

41

Since her initial theory of retaliation proved to be false, Green now argues that Monique Coleman failed to follow company policy on outside requests for financial information.  (Doc. #78, at 24–25.)  This is an improper attempt by Green to amend her complaint at the summary judgment stage.  A non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion.  *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004).  Even if the Court were to consider Green's argument, Green fails to establish causation under the *Nassar* standard because Monique Coleman was not even aware of Green's opposition to sexual harassment and, therefore, could not have been motivated to retaliate against Green by her protected activity.  (Doc. #61-11, at ¶ 7.)  As a result, Green has failed to create any triable issue of fact on her retaliation claim, and summary judgment is GRANTED in favor of MOBIS on Green's Title VII retaliation claims in Count 3 of her Amended Complaint.

### 4.        Negligent and Wanton Supervision

Green asserts a state law claim for negligent supervision against Mobis (Count 4) based on MOBIS's failure to prevent Powers's sexual harassment.  (Doc. #42, at ¶¶ 70–74.)  An employer is liable for negligent supervision if the employer has actual or constructive notice of his employee's incompetency.  *Mardis v. Robbins Tire & Rubber Co.*, 669 So. 2d 885, 889 (Ala. 1995).  A plaintiff must show that the employer would have discovered the employee's incompetency through the exercise of proper diligence.  *Id.*  Wanton supervision requires the employer to consciously disregard a known risk that an employee is performing a tortious action.  *Big B, Inc. v. Cottingham*, 634 So. 2d 999, 1004 (Ala. 1993).  In this case,

Green alleges MOBIS failed to adequately prevent Powers's sexual harassment, but the Court is left to guess in what way MOBIS negligently or wantonly failed to prevent sexual harassment.

There is no evidence that MOBIS was negligent, much less wanton, in failing to prevent or correct Powers's acts of alleged assault and battery, invasion of privacy, and intentional infliction of emotional distress.   MOBIS promulgated an effective sexual harassment policy and acted promptly to correct the harassment once it discovered Green's anonymous complaint.   There is no evidence that MOBIS could have discovered Powers would sexually harass employees through the exercise of due diligence.   Therefore, summary judgment is GRANTED in favor of MOBIS on Green's claim of negligent and wanton supervision/hiring/training in Count 4 of the Amended Complaint.

### 5.    Invasion of Privacy, Assault and Battery, Intentional Infliction of Emotional Distress

Green has asserted tort claims for invasion of privacy (Count 5), assault and battery (Count 6), and intentional infliction of emotional distress (Count 7) against both Powers and MOBIS.   Powers has not moved for summary judgment.   An employer is liable for the intentional torts of an employee only if (1) the employee's wrongful acts were committed in the line and scope of employment; (2) the acts were committed in furtherance of the business of the employer; or (3) the employer participated in, authorized, or ratified the wrongful acts. *Mardis v. Robbins Tire & Rubber Co.*, 669 So. 2d 885, 889 (Ala. 1995).  Green has presented no evidence at all that MOBIS is responsible for Powers's intentional torts.   Powers's

43

conduct was not committed in the line and scope of his employment because sexually harassing behavior of this nature is "entirely personal in nature and not within his assigned duties." *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d 1190, 1194 (Ala. 1998). Powers's conduct was not in furtherance of MOBIS's business since sexual harassment is "aimed solely at satisfying the [employee's] own lustful desires" rather than any goal of the employer. *Id.* Nor is there any evidence MOBIS participated in or ratified Powers's conduct. Rather, MOBIS terminated Powers after investigating Green's allegations. Therefore, MOBIS is not liable for the intentional torts of Powers, and summary judgment is GRANTED in favor of MOBIS on Green's state claims for invasion of privacy, assault and battery, and intentional infliction of emotional distress in Counts 5–7 of the Amended Complaint.

### 6.    Family and Medical Leave Act

Green asserts interference and retaliation claims against MOBIS under the Family and Medical Leave Act ("FMLA") in Count 9 of her Amended Complaint. Green's interference claim is based on MOBIS's supposed "scrutiny" of Green's doctor's excuses after Green had used all of her paid leave. (Doc. #78, at 82.) However, the undisputed evidence shows that MOBIS's policy is to verify an employee's absence with the doctor when the employee provides a copy of a doctor's note rather than an original. MOBIS approved Green for FMLA leave and applied the same verification procedure to her doctor's excuses as it does to any employee. MOBIS's termination of Green was the result of its good faith belief that she provided forged doctor's notes to it and did not interfere with legitimate use of FMLA

44

leave.  Green's FMLA retaliation claim is based on the exact same facts as her Title VII retaliation claim.  For the same reasons as her Title VII retaliation claim, Green has failed to raise a genuine dispute of fact that MOBIS retaliated against her for engaging in statutorily protected activity under the FMLA.  Therefore, summary judgment is GRANTED in favor of MOBIS on Green's FMLA claims in Count 9 of the Amended Complaint.

### 7.    State law claims against Powers

Green asserts state law claims against Powers for invasion of privacy (Count 5), assault and battery (Count 6), and intentional infliction of emotional distress (Count 7). (Doc. #42.)  The Court has supplemental subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1367.  Section 1367(c)(3) provides that a "district court may decline to exercise supplemental jurisdiction over a claim if . . . the district court has dismissed all claims over which it has original jurisdiction."  Because the federal claims over which this Court had original jurisdiction have been resolved against Green, the Court declines to exercise its supplemental jurisdiction over the state law claims against Powers and, instead, dismisses them without prejudice.  *See* 28 U.S.C. § 1367(c)(3); *Un. Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726–27 (1966).  This dismissal should not work to Green's disadvantage if she chooses to bring these claims in State court because the statute of limitations for this claim is tolled during the pendency of this action.  *See* 28 U.S.C. § 1367(d).

### V.  CONCLUSION

Based on the foregoing, it is hereby ORDERED as follows:

1.     Green's Motion to Strike the Declaration of Kevin Green (Doc. #78) is GRANTED.

2.     Green's Motion to Strike Defendant's Supplemental Evidentiary Submission (Doc. #92) is DENIED.

3.     MOBIS's Motion for Summary Judgment (Doc. #58) is GRANTED as to all of Green's claims, and Green's Amended Complaint is DISMISSED WITH PREJUDICE.

4.     The state law claims against Powers (Counts 5–7 of the Amended Complaint) are DISMISSED WITHOUT PREJUDICE.

5.     The trial of this case is CANCELLED.

A separate final judgment will be entered in accordance with this Memorandum Opinion and Order.

DONE this the 5th day of February, 2014.

_____/s/  Mark E. Fuller_____
UNITED STATES DISTRICT JUDGE